GREEN CEDAR, LLC, d/b/a , Crazy Horse
Complex, FOUAD GHANTOUS, an
individual, PHREDCO, INC., d/b/a,
Club Christophers, CHRISTOPHER
WHITE, an individual, and JAMES
SPOONER, an individual,

                Plaintiffs,

vs.                                          Case No. 3:11-cv- 526-J-37TEM

CLAY COUNTY, FLORIDA, a subdivision
of the State of Florida,

                Defendant.

_____

## ORDER

This cause is before the Court on the following:

1)     Defendant Clay County, Florida's ("Clay County" or "Defendant")
Motion for Summary Final Judgment and Incorporated Memorandum
of Law (Doc. No. 47), filed on November 3, 2011;

2)     Plaintiffs' Response to Defendant's Motion for Summary Judgment
(Doc. No. 55), filed on December 8, 2011;

3)     Defendant's Reply to Plaintiffs' Response to Defendant's Motion for
Summary Final Judgment (Doc. No. 64), filed on December 26, 2011;

4)     Plaintiffs' Motion for Summary Judgment and Incorporated
Memorandum of Law (Doc. No. 49), filed on November 3, 2011;

5)     Defendant's Memorandum in Opposition to Plaintiffs' Motion for
Summary Judgment (Doc. No. 54), filed on December 8, 2011; and

6) Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion for Summary Judgment (Doc. No. 65), filed on December 27, 2011.

## BACKGROUND

In this 42 U.S.C. § 1983 action, Plaintiffs challenge the constitutionality of two Clay County ordinances, Ordinance No. 2011-14 (the "Zoning Ordinance") and Ordinance No. 2011-13 (the "Hours Ordinance") (collectively, the "Ordinances"), enacted by the Board of County Commissioners, Clay County (the "Board") in May 2011. As described in greater detail below, the Ordinances prohibit the sale of alcohol past 11:00 p.m. in all "large lounges" located in a 1.9 mile segment where Wells Road runs through Clay County.

### A. The Ordinances

#### 1. The Hours Ordinance

On May 10, 2011, the Board adopted Clay County Ordinance No. 2011-10, amending Clay County Ordinance Section 3-2. (Doc. No. 19, ¶ 46.) On May 24, 2011, the Board passed Ordinance No. 2011-13, which is identical to Ordinance No. 2011-10, but for the addition of one additional "Finding," set forth as Section 4(x) to the Hours Ordinance. (Doc. No. 47, p. 2.) This ordinance limits the hours during which a "large lounge"[1] operating under a 4COP quota license within the "Wells Road Corridor"[2] may sell alcoholic

---

[1] A "large lounge" is defined in the ordinance as "an establishment operating under a lounge license, the licensed premise of which is greater than 4,750 square feet in area." (Doc. No. 19-2, pp. 14, 26 (definitions in the Hours Ordinance and Zoning Ordinance, respectively).)

[2] The Ordinances define the "Wells Road Corridor" as that portion of the unincorporated area of Clay County that lies within 500 feet of any portion of the right of way of the section of Wells Road extending from the municipal limits of the Town of Orange Park west to a line across the width of said right of way that is perpendicular to the centerline thereof and passes through the point on said centerline that lies 750 feet west of the intersection of the centerlines of Wells Road and State Road 21, all as now

beverages. (*See* Doc. No. 19-2, p. 14.) In short, the Hours Ordinance requires large lounges to stop selling alcohol at 11:00 p.m., approximately three hours earlier than the other entertainment venues, such as restaurants and liquor stores, selling liquor in the Wells Road Corridor, or located outside of the Wells Road Corridor.

## 2. The Zoning Ordinance

On May 24, 2011, the Board also adopted Ordinance No. 2011-14, amending the county's existing zoning code. The Zoning Ordinance serves as a companion to the Hours Ordinance. It prohibits the establishment of new large lounges within the Wells Road Corridor and requires the large lounges currently operating in the Wells Road Corridor to cease operations within five years.[3] (*See* Doc. 19-2, pp. 25-36.)

## 3. Justification for the Ordinances

The justifications for the Ordinances are set out in the "Findings" section of each. (Doc. No. 19-2, pp. 14-20 (Hours Ordinance); pp. 26-32 (Zoning Ordinance).) The findings are nearly identical in both Ordinances. The first seven findings describe the "character of the Corridor and its significance to the County." (Doc. No. 47, p. 4 (citing Doc. No. 19-2,

---

established." (Doc. No. 19-2, pp. 14, 22.)

[3] The "Sunset Provision" of the Zoning Ordinance states:

(e)  Any other provisions of this Article III to the contrary notwithstanding, any large lounge in active operation on any parcel of land to which this Section 3-47 is applicable under subsection (b) as of the effective date of this Section 3-47 shall be deemed to be a nonconforming use of land until the date that is five calendar years following the effective date of this Section 3-47, whereupon it shall become unlawful and must cease operations. During the five year period of nonconformity, such use may lawfully continue, subject to the provisions and limitations set forth in Section 3-11 hereof.

(Doc. No. 19-2, p. 35.)

pp. 15-16 (Hours Ordinance); pp. 27-28 (Zoning Ordinance)).) Next, findings (a) through (g) describe the "negative impact of the three large lounges on the corridor: crime and disturbances of the peace; actual crime statistics relating to the Corridor; and information provided by the Sheriff's Office regarding the 'extraordinary monitoring and interdiction activities' [required] to control the impact of the large lounges, . . . which [are] not required for smaller lounges also located within the corridor." (*Id.* (citing Doc. No. 19-2, pp. 18-20 (Hours Ordinance); pp. 29-31 (Zoning Ordinance).) The Ordinances include tables with data provided by the Clay County Sheriff's Office, exhibiting the number of "criminal arrests" between the hours of 10:00 p.m. and 2:00 a.m. within the Wells Road Corridor from 2007 to 2010.[4] (Doc. No. 19-2, pp. 18-19 (Hours Ordinance); pp. 30-31 (Zoning Ordinance).) Additionally, they provide tables that show the number of arrests specifically for "driving under the influence," "uniform traffic citations," and "calls for service," within the Wells Road Corridor. (*Id.*) Further, the Ordinances contain general information from the "National Gang Intelligence Center," which relates to the County's concern that "large lounges" attract gang members from various parts of Jacksonville into the Wells Road Corridor. (*Id.* at p. 17 (Hours Ordinance); p. 29 (Zoning Ordinance).) In total, the Ordinances include approximately twenty-four findings the County considered before it enacted the

---

[4] Lieutenant Barry L. Abramowitz ("Lt. Abramowitz") prepared a memorandum for Sheriff Rick Beseler on or before January 24, 2011, discussing the Wells Road Corridor and the resources the Clay County Sheriff's office provides to address the high concentration of persons that are drawn to the area to attend Club Christophers, Club Chameleon, and the Crazy Horse Complex (sometimes referred to as "Crazy Horse"). (Doc. No. 47-7.) On May 17, 2011, he submitted an updated version of the memorandum to the Sheriff, adding "more detailed data including corrected and more accurate crime suppression activities, the number of arrests [in the Wells Road Corridor] during the hours of 10pm and 2am, and gang activity." (Doc. No. 47-10.) This memorandum serves as the basis for most of the research pertaining to crime in the Wells Road Corridor provided in the Ordinances.

Ordinances.[5]

**4. Hearings on the Ordinances**

On April 18, 2011, the Clay County Policy, Rules and Human Services ("PRHS") Committee held a meeting at which they considered what would become the Hours Ordinance and the Zoning Ordinance. (*See* Doc. No. 48-7.) There were no citizens from the community present at this meeting. It was attended by the County Manager, the County Attorney (who drafted the Ordinances), Vice Chair of the PRHS Committee, Chairman of PRHS Committee, and Development Services General Manager. (Doc. No. 48-7, p. 4.) The PRHS ultimately agreed to send the Ordinances to the Board and to Planning Commission for their respective recommendations. (*See* Doc. No. 48-7, p. 2; Doc. No. 48-1, Apr. 18, 2011 Hr'g Tr. at 9:9-12.)

---

[5] "Finding (x)" explains the Board's rationale for restricting the hours for alcohol sales at the large lounges as opposed to smaller lounges as follows:

(x)     Based on information from the records of the County's Property Appraiser, the area of the licensed area premises for the larger of the two small lounges mentioned in subsection (h) [which describes the "fifteen" business establishments in the Wells Road Corridor operating under a 4COP or 2COP license] is approximately 4,500 square feet. In that the small lounges have not required the extraordinary monitoring and interdiction activities implemented for the large lounges, as described in subsection (n), nor have been the sources of crimes and disturbances to the peace on the scale experienced with the large lounges, the use of 4,500 square feet plus an additional 250 square feet as a basis for establishing the maximum licensed premises area above which the more restrictive regulations accomplished by this ordinance apply, is sensible and logical. As the 4,500 square feet for the area of the licensed premises for the larger of the two small lounges mentioned in subsection (h) is known to be an approximation, the additional 250 square feet provides a reasonable margin for error to avoid the inadvertent application of the more restrictive regulations to the larger of the two small lounges.

On April 26, 2011, the Board held a "regular session," which community members attended and expressed their views (some in favor, some against) the Hours and Zoning Ordinances. (Doc. No. 48-2, Apr. 26, 2011 Hr'g Tr.) At the conclusion of that meeting, the Board recommended both Ordinances move forward towards adoption, and sent the Zoning Ordinance to the Clay County Planning Commission ("Planning Commission") for its review. (*Id.* at 11:3-22.) On May 3, 2011, the Planning Commission held a meeting at which they discussed the Zoning Ordinance in detail. (Doc. No. 48-3, May 3, 2011 Hr'g Tr.) Some citizens who live or operate businesses in or near the Wells Road Corridor attended and voiced their opinions on the Zoning Ordinance at this meeting as well.

Additionally, before the Ordinances were adopted, the Board held three public hearings. In accordance with "established procedure," the agendas and information gathered by the County in connection with the Board's consideration of the Ordinances was posted on the County's public website more than seventy-two hours prior to the hearings. (Doc. No. 47-2, pp. 2-4, Scruby Declaration, ¶ 4.) The Board held two public hearings on the Zoning Ordinance; one at 5:00 p.m. on May 10, 2011, and one at 2:00 p.m. on May 24, 2011. (*Id.*) It also held a public hearing on the Hours Ordinance on May 10, 2011 at 2:00 p.m. (*Id.* at ¶ 2.)

At the May 10, 2011 hearing, the Board heard from a number of citizens from the community who opposed the enactment of the Ordinances, including a number of employees from Crazy Horse and Club Christophers. (Doc. No. 48-4, May 10, 2011 Hr'g Tr.) Mr. Christopher White, the owner of Club Christophers, attended and asked the Board not to adopt the Ordinances. (May 10, 2011 Hr'g Tr. at 21:8 - 23:25.) Employees from both establishments expressed their concerns that enforcement of the Hours Ordinance

alone would cause them to close within thirty days. (*See id.* at 27:14-20.) They described

the large lounges as safe places, frequented by "good people," and disputed any "Findings"

that suggested otherwise. (*See* May 10, 2011 Hr'g Tr. 9:24-53:5; 63:12-66:4.) Mr. Yokan,

Crazy Horse's counsel attended the hearing as well. He argued that the Ordinances would

not pass constitutional muster. (May 10, 2011 Hr'g Tr. at 49:11- 50:13).

Also present at the May 10, 2011 meeting were citizens who spoke in favor of the

Ordinances. They affirmed the facts set forth in the "Findings," describing instances of

violence, noise disturbances, and an increase in crime the Wells Road Corridor since the

large lounges were established. (May 10, 2011 Hr'g Tr. 53:10-62:17; 66:7-69:20.)

Finally, on May 24, 2011, the Board held its second public hearing on the Zoning

Ordinance. (*See* Doc. No. 48-5.) Both opponents and proponents of the Ordinances

attended and had the opportunity to be heard. The commissioners and opponents

acknowledged the imperfect solution the Ordinances offered, and discussed alternative

ways to address the crime and late night crowds within the Corridor. At the end of the

hearing, the Board ultimately decided to adopt both.

The Ordinances were drafted to take effect June 1, 2011. (Doc. No. 7-1, ¶ 2.)

However, Plaintiffs filed this lawsuit on May 24, 2011, and on May 27, 2011, the parties

filed a "Stipulation Regarding Enforcement of Clay County Ordinance No. 2011-10,"[6] in

which Defendant agreed to withhold enforcement of the Ordinances until the entry of final

summary judgment or a final judgment following a bench trial or jury verdict on these

---

[6] The Court construes this stipulation to apply to Ordinance No. 2011-13, the
amended and operative version of the Hours Ordinance, and Ordinance No. 2011-14, the
Zoning Ordinance. (*See* Doc. No. 7-1, ¶ 5.)

issues.  (*See* Doc. No. 7-1, ¶ 3.) [7]

**B.     The "Large Lounges"[8]**

**1.     The Crazy Horse Complex**

The Crazy Horse Complex is owned and operated by Green Cedar, LLC ("Green Cedar").  (Doc. No. 19, ¶10.)  Green Cedar has a 4COP liquor license, issued by the state of Florida to operate Crazy Horse.  (*Id.* at ¶ 19.)  The 4COP license authorizes Green Cedar to sell alcohol for on premises consumption at Crazy Horse and to sell packaged alcohol beverages for consumption off premises.[9]  (*Id.*)  Crazy Horse sits within a commercially zoned district that permits nightclubs, and prior to the enactment of the Ordinances there were no restrictions on the size of entertainment venues in that area.  (*Id.* at ¶ 20.)  Green Cedar did not need to acquire any exception or variance to Clay County's comprehensive zoning plan to open a nightclub or retail liquor store.  (*Id.*)

Green Cedar opened Crazy Horse in the Wells Road Corridor in November 2009, and has operated continuously since that time.  (*Id.* at ¶ 21.)  It is open from Wednesday night through Saturday night each week of the year.  (*Id.* at ¶ 24.)  It features country music, country music dance classes, line dancing, and dancing to contemporary music.

---

[7] If Defendant decided to enforce the Ordinances prior to the culmination of this action, it stipulated that it would give Plaintiffs fourteen (14) days notice.

[8] The third "large lounge" that is impacted by the ordinance, Club Chameleon, is not a party to the action.  At the January 23, 2012 hearing, Defendant's counsel informed the Court that Club Chameleon has been sold and will operate as a day care center in the future.  As such, Crazy Horse and Club Christophers are the only remaining large lounges in the Wells Road corridor.

[9] A 4COP license enables the licensee to serve all types of legal alcohol beverages, whereas some licenses, such as the "2COP license" only authorizes the sale of beer and wine.  *See JPM Inv. Group, Inc. v. Brevard Cnt'y Bd. of Cnt'y Com'rs*, 818 So. 2d 595, 597 (Fla. 5th Dist. Ct. App. 2002).

8

(*Id.*)  It has operated between the hours of 6:00 p.m. and 2:00 a.m. throughout the time it has been open.  (*Id.*)  Over eighty-five percent of Crazy Horse's total revenues are generated on a nightly basis between the hours of 11:00 p.m. and 2:00 a.m.  (*Id.* ¶ 25.)

### 2.     Club Christophers

Club Christophers is owned and operated by Phredco, Inc. and White Night, Inc. (Doc. No. 19, ¶ 29.)  Christopher White and James Spooner "are the shareholders who own those two corporations."  (*Id.*)  Phredco, Inc. and White Night, Inc. has a 4COP liquor license, issued by the state of Florida to operate Club Christophers.  (*Id.* at ¶ 38.)  Like Crazy Horse, Club Christophers is permitted to sell alcoholic beverages for consumption on premises and to sell packaged alcoholic beverages for consumption off premises.  (*Id.* at ¶ 38.)  Club Christophers is also licensed as a full service restaurant, and has a full service kitchen.  (*Id.* at ¶ 43.)

Club Christophers is open Monday night and Wednesday through Saturday night. (*Id.* at ¶ 39.)  Since opening in 2002, it has operated between the hours of 3:00 p.m. and 2:00 a.m., but it generates over eighty-five percent (85%) of its total revenue on a nightly basis from 11:00 p.m. through 2:00 a.m., the majority of which is derived from alcohol sales.  (*Id.* at ¶ 41.)  (*Id.*)  Club Christophers only admits those twenty-one years of age or older, and features rhythm and blues music as entertainment.  (*Id.* at ¶ 40.)

### STANDARD OF REVIEW

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1356 (11th Cir. 2007)).  Which facts are material depends on

the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Evidence is reviewed in the light most favorable to the non-moving party. *Fennell*, 559 F.3d at 1216 (citing *Forman*, 509 F.3d at 1356). A moving party discharges its burden by showing that there is an absence of evidence to support the non-moving party's case. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) (stating "conclusory allegations without specific supporting facts have no probative value"). This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the [C]ourt must deny the motion and proceed to trial." *Id.* (quoting *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983)).

In the context of cross-motions for summary judgment, the denial of one does not require the Court to grant another. *Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co.*, 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008).

**DISCUSSION**

On July 5, 2011, Plaintiffs filed their Amended Complaint (Doc. No. 19), which serves as the operative complaint in this matter. They seek to permanently enjoin Defendant from enforcing the Ordinances. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, alleging violations of procedural due process (Count I), substantive due process (Count II), and equal protection (Counts III and IV). They also allege that the Ordinances constitute "reverse spot zoning" (Count V). (Doc. No. 19, pp. 16-25.) On November 3, 2011, Defendant filed its Motion for Summary Judgment as to all claims (Doc. No. 47) and Plaintiffs filed their Motion for Summary Judgment as to Counts I, II, and III (Doc. No. 49).

**A.    Counts I & II: Due Process Claims**

**1.    Applicable Law**

In Plaintiffs' Complaint (Doc. No. 19) they include a claim for "Procedural Due Process" (Count I) and a claim for "Substantive Due Process" (Count II), but in both their Motion for Summary Judgment (Doc. No. 49) and their Response to Defendant's Motion for Summary Judgment (Doc. No. 55), Plaintiffs meld their due process arguments together. Plaintiffs argue, "Regardless of which component of due process the Court travels under [it] should find that the Ordinances in question violate the due process clause." (Doc. No. 49, p. 16.) Plaintiffs fail to recognize the distinct nature of "procedural" and "substantive" due process. Nevertheless, the Court addresses both forms of due process, separately, below.

The Fourteenth Amendment's "Due Process Clause" provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Supreme Court's interpretation of this clause explicates that the

amendment provides two different kinds of constitutional protection: procedural due process and substantive due process." *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994). As its name implies, "procedural due process" imposes **procedural** limitations on a State's power to take away protected entitlements. *See Jones v. Flowers*, 547 U.S. 220, 226–39 (2006) (emphasis added); *Gadzinski v. City of Ft. Walton Beach*, No. 3:10cv425, 2011 WL 2690403, at *3 (N.D. Fla. July 8, 2011). The "substantive" component of the Due Process Clause, on the other hand, "protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" *McKinny*, 20 F.3d at 1556. A finding that a right merits substantive due process protection means that the right is protected against certain government actions regardless of the fairness of the procedures used to implement them." *Id.* (citations omitted).

Before Plaintiffs can prevail on the merits of their substantive or procedural due process claims, they must first prove that the facts of their case implicate federally protected rights. *See Rymer v. Douglas Cnty.*, 764 F.2d 796, 801 (11th Cir. 1983). Plaintiffs claim that the Hours and Zoning Ordinances deprive them of significant property interests, including their right to use their 4COP liquor license, "entitlements" to which the state granted them. (Doc. No. 19, ¶ 74.) At least one U.S. District Court in Florida has recognized that an "entitlement" to a state granted liquor license has not been clearly established as a constitutionally protected interest. *VFW John O'Connor Post #4833 v. Santa Rosa Cnty., Fla.* 506 F. Supp. 2d 1079, 1094 n.20 ("That the [plaintiff] possesses such a protected property right, however, is questionable. (citing *Walling Enters., Inc. v. Mathias*, 636 So. 2d 1294, 1296-97 (Fla. 1994) (stating that an alcoholic beverage license amounts to no more than the grant of a privilege; the license is not property in the

constitutional sense); *Greenbriar Vill., L.L.C. v. Mountain Brook, City*, 345 F.3d 1258, 1265 (11th Cir. 2003) (per curiam) (stating that plaintiff must show it has a federally protectable property right in order to establish a procedural due process claim because no such claim "exists until a sufficiently certain property right under state law is first shown.").

Plaintiffs also maintain they have a protected "liberty interest" in their right to "engage in a lawful business and to pursue a livelihood." (Doc. No. 19, ¶ 74.) In other words, they argue the Ordinances violate their constitutionally protected right in the operation of their respective large lounges. Plaintiffs offer no controlling precedent to support this alleged "right" to operate their respective liquor licensed establishments. Regardless, even assuming that federally protected rights are at issue in this action, the Court finds for the reasons discussed below that Defendant did not violate Plaintiffs' procedural or substantive due process rights.

## 2.    Count I: Procedural Due Process

In order to determine whether Defendant violated Plaintiffs' procedural due process rights, the Court must first determine whether the government action at issue is "adjudicative" or "legislative." When government action is "legislative," individuals impacted by such action are not entitled to procedural due process beyond that which the legislative process affords them. *75 Acres, LLC v. Miami-Dade Cnty., Fla.*, 338 F.3d 1288, 1294 (11th Cir. 2003) ("[W]hen a regulation is legislative in nature, the legislative process (wherein elected officials are accountable to the electorate) is all the process that is due.")

Notwithstanding that the Eleventh Circuit has declined to adopt a "hard-and-fast rule for distinguishing between legislative and adjudicative action," the current record establishes that the Board engaged in "legislative action." *See id.* at 1296 n.11. "A

legislative act involves policy-making rather than mere administrative application of existing policies." *Crymes v. Dekalb Cnty., Ga.*, 923 F.3d 1482, 1485 (citing *Minton v. St. Bernard Parish Sch. Bd.,* 803 F.2d 129,135 (5th Cir. 1986)). The Eleventh Circuit has concluded that even ordinances that have a significant impact on one property owner are generally legislative in character.  *See 75 Acres*, 338 F.3d at 1297 (referencing *United States v. Fla. E. Coast Ry. Co.* 410 U.S. 224, 244-46 (1973) ("While it is true that the County's moratorium ordinance has been applied specifically to 75 Acres' property in this case, such an observance does not detract from the fact that the moratorium resulted from the application of a generally applicable ordinance."

It is well settled that the Zoning Ordinance constitutes a legislative act. *Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1409 (11th Cir. 1989) "Under both federal and Florida law, zoning and land use decision-making, . . . is normally characterized as a legislative function." *Id.* (citing *Hernandez v. City of Lafayette*, 643 F.2d 1188, 1193-94 (5th Cir. 1981) (mayor's veto of zoning ordinance passed by city's legislative body), *cert. denied*, 455 U.S. 907 (1982); *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980) (local council members held to have acted within scope of legislative activities when they voted on zoning ordinance); *S. Gwinnett Venture v. Pruitt*, 491 F.2d 5, 7 (5th Cir. 1974) (en banc) (local zoning is quasi-legislative procedure, not subject to federal juridical consideration absent arbitrary action), *cert. denied*, 419 U.S. 837 (1974); *Fla. Land Co. v. City of Winter Springs*, 427 So. 2d 170, 174 (Fla. 1983) (zoning ordinance which effected a change in zoning for a specific parcel of land was a legislative act); *Schauer v. City of Miami Beach*, 112 So. 2d 838, 839 (Fla. 1959) (amending zoning ordinance was legislative function)).  The Hours Ordinance is equally "legislative" in nature.  The undersigned agrees

with Magistrate Judge Morris's reasoning that:

> [T]he Hours Ordinance does not involve the application of existing policy to specific individuals but rather the formulation of a new policy with general application, which is the hallmark of legislative activity. *See Brown v. Crawford Cnty.*, 960 F.2d 1002, 1011 (11th Cir. 1992) ("[A] legislative act is characterized by having a policymaking function and general application."); *Bannum, Inc. v. City of Beaumont*, 236 F. Supp. 2d 633, 635 (E.D. Tex. 2002) ("[T]he more the general community is affected by the action, the more likely it is a legislative act."). Although the policy only currently impacts three properties, in passing the ordinance the county commissioners "created neutral, prospective rules that apply to all current and future owners of the property." *Biblia Albierta v. Banks*, 129 F.3d 899, 904-05 (7th Cir. 1997). Through the Hours Ordinance, the commissioners created a policy that drew a line between establishments which may serve alcohol past 11 p.m. and those which may not. *See Yeldell v. Cooper Green Hosp.*, 956 F.2d 1056, 1062-63 (11th Cir. 1992) ("Legislative acts are those which involve policy-making decision of a general scope, or to put it another way, legislation involves line-drawing.").

(Doc. No. 42, pp. 10-11.)

Moreover, as described in the "Background" Section of this Order, above, the Board employed the legislative process before it enacted the Ordinances. First, the PRHS Committee considered the Ordinances. (*See* Doc. No. 29-1.) The Committee approved the Ordinances and sent them to the Board and the Planning Commission. After the Board held a regular meeting, at which the Ordinances were discussed publicly, the Ordinances were sent to the Planning Commission for its consideration. (Doc. No. 29-3.) After the Planning Commission recommended approval of the Zoning Ordinance, the Board held a public hearing on the Hours Ordinance and two public hearings on the Zoning Ordinance.

Further, in reaching its decision to adopt the Ordinances, the Board considered substantial evidence. This evidence included, for example, the January 24, 2011, memorandum by Lt. Abramowitz of the Organized Crime Section of the Clay County Sheriff's Department (Doc. No. 19-3); an April 18, 2011, e-mail written by Sargent Andrew

Scott of the Sheriff's Department, which discussed gang members frequenting the large lounges (*id.*); and the observations of least one Commissioner who "rode with the Sheriff's department" twice (two different Saturdays, at 3:00 a.m. and 4:00 a.m.) (May 24, 2011 Hr'g Tr. at 29:12-17.)  This evidence, along with the additional information set forth in the "Findings" Section of the Ordinances, "demonstrate a formulation of policy and the consideration of public concerns that impacted the entire County." (*See* Doc. No. 47, p. 7.)

When government action is legislative in nature, "property owners generally are not entitled to procedural due process." *75 Acres*, 338 F.3d at 1294.  "The challenge to such laws must be based on their substantive compatibility with constitutional guarantees." *Id.* Accordingly, the Court finds that Defendant is entitled to summary judgment on Count I.

### 3.    Count II: Substantive Due Process

Although the Court has declined to determine the precise nature of the rights at issue in this action, Plaintiffs do not contend the Ordinances deprived them of any "fundamental" rights.  Throughout their filings, Plaintiffs assert that Defendant had "no conceivable rational basis" for enacting the Ordinances.  Further, at the January 23, 2012 hearing, Plaintiffs conceded that this Court should use the rational basis test to determine whether the Ordinances pass constitutional muster.

To withstand a substantive due process challenge, a legislative enactment cannot be "arbitrary, capricious or without a rational or reasonable relationship to the public health, safety, morals, or general welfare." *Euclid v. Ambler Realty Co.,* 272 U.S. 366, 295 (1926). Where, as here, the legislation being challenged does not deprive an individual of a "fundamental right," the Court applies the "rational basis test" to determine whether it is

constitutional.  219 S. *Atl. Blvd. Inc. v. City of Ft. Lauderdale, FL*, 239 F. Supp. 2d 1265, 1276 (S.D. Fla. 2002) (citing *Ga. Mfr. Hous. Ass'n, Inc. v. Spalding Cnty.*, 148 F.3d 1304, 1307 (11th Cir. 1998)).  The rational basis test consists of a two-prong inquiry: (1) the Court must identify a legitimate government purpose and  (2) the Court must determine whether "a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose." *Haves v. City of Miami*, 52 F.3d 918, 921-22 (11th Cir. 1995).

### a.    A Legitimate Government Purpose

The Court must first determine whether the Ordinances serve a "legitimate government purpose - a goal - which the enacting government body could have been pursuing.  The *actual* motivations of the enacting governmental body are entirely irrelevant."  *Haves*, 52 F.3d at 922.  As described in the Background Section of this Order, the Ordinances include a number of "Findings" that articulate some of the reasons why the Board decided to enact the Ordinances.  The Ordinances also include a stated purpose "to preserve and promote the peace, security and economic success of the Wells Road Corridor."  (Doc. No. 19-2, pp. 20, 31.)  In addition to the "purpose" included in the Ordinances, both contain the following provisions:

> (g)    Given the high density of population within and immediately proximate to the Wells Road Corridor, the significant numbers of retail, restaurant and other commercial establishments therein, the high volumes of customers drawn into the Wells Road Corridor by such establishments, and the importance of the Wells Road Corridor to the County in terms of taxable value and employment opportunities, the Board has a compelling interest in preserving and promoting the peace, security and economic success of the Wells Road Corridor through the enactment of appropriate regulations.

***

(k)     For the benefit and protection of the businesses and residents in the area of the Wells Road Corridor, the Board desires to implement reasonable measures to discourage gangs and gang members from entering and meeting within the County, thereby lessening the occasions and opportunities for gangs and gang members to engage within the County in the activities described in the quotation from the 2009 National Gang Threat Assessment set forth in subsection (j). The adoption of this ordinance, which prohibits new large lounges within the Wells Road Corridor and eventually eliminates the operation of the existing large lounges within the Wells Road Corridor, is such a measure.

(*Id.* at pp. 16-17, 28, 29, 34.)

At the April 26, 2011 hearing on the Ordinances, constituents from the community spoke in favor of the Ordinances.  For example, Mr. Ash Tisdelle, who has "been a businessman on Wells Road since '84" explained that in the last two or three years the Wells Road area has been in decline.  (Apr. 26 2011 Hr'g Tr. 6:6-13.)  In his opinion, the negative changes were brought about by "the venues that are open to– how else would I say it than the rowdy type of individual who doesn't care too much for anybody else, is much more content in greater numbers to run things their way."  (*Id.* at 6:12-18.)  Another individual, Mr. Dyer, the operations manager at a business in the Wells Road Corridor, voiced similar concerns. (Apr. 26, 2011 Hr'g Tr. at 8:24-9:21.)[10]

"The information and views the citizens presented to their government officials at these meetings involved the same general welfare concerns that the Supreme Court and [the Eleventh Circuit] have repeatedly held are rational and permissible bases for land use restrictions: noise, traffic, congestion, safety, aesthetics, valuation of adjoining land, and

---

[10]  The Court recognizes that a number of people spoke *against* the Ordinances at the public hearings held on May 10, 2011 and May 24, 2011.  The question addressed here, however, is not whether the community at large favored the Ordinances, but rather the Board had a "legitimate government purpose."

effect on city services." *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1387 (11th Cir. 1993). After a review of all evidence, and based on well-established Eleventh Circuit precedent, the Court finds that the Ordinances were enacted pursuant to a "legitimate government interest."

### b.    A Conceivably Rational Basis

The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body "to believe that the legislation would further the hypothesized purpose. The proper inquiry is concerned with the existence of a **conceivably rational basis**, not whether that basis was actually considered by the legislative body." *Ga. Mfr. Hous. Ass'n*, 148 F.3d at 1307 (emphasis added) (citing Haves, 52 F.3d at 922 (internal quotations and citations omitted); *TRM, Inc. v. United States*, 52 F.3d 941, 945-46 (11th Cir. 1995)). "As long as reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational, the legislation survives rational-basis scrutiny." *Id.*

In their Motion for Summary Judgment (Doc. No. 49), Plaintiffs raise numerous arguments questioning the validity of the Ordinances' "Findings," and contend that the Board "overlooked" information that it should have considered before it enacted the Ordinances. (*See* Doc. No. 49, pp. 5-10.) For example, they maintain that the Board "had no idea what square footage had to do with the capacity of any venue on Wells Road" and, as such, "had no idea what setting the arbitrary size of 4,750 square feet meant for capacity." (*Id.* at pp. 17-18.)

While the Court is not without sympathy for Plaintiffs, given the detrimental effect

that the Ordinances will have on their businesses, decades of constitutional jurisprudence prohibit its review of the Ordinances–or any of the findings on which the Board based its decision to enact them–other than to determine whether they are "rationally related" to a "legitimate government interest." Whether the Court agrees with the Board's decision, or whether it could, subjectively, find arguably "more" rational ways to achieve a legitimate government purpose is, quite frankly, immaterial. The Court must find the Ordinances survive "rational basis review even if [they] seem unwise . . . or if the rationale for [them] seems tenuous." *Leib v. Hillsborough Cnty. Pub. Transp. Com'n*, 558 F.3d 1301, 1306 (11th Cir. 2009) (internal citations omitted); *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993) (explaining that under rational basis review, a court must accept a legislature's generalizations even when there is an imperfect fit between means and ends).

"The law is well settled that legislated zoning ordinances are permissible, constitutional uses of police power and are not reviewable by district courts unless they are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Serpentfoot v. Rome City Comm'n*, 322 F. App'x 801, 806 (11th Cir. 2008) (citing *Grant v. Seminole Cnty., Fla.*, 817 F.2d 731, 736 (11th Cir. 1987) (per curiam) (quotation marks and citation omitted));*Corn*, 997 F.2d at 1374-75 (listing numerous "legitimate zoning interests," including protection from the "ill effect of urbanization," and "concern about the effect of the proposed development on traffic," and citing other Circuits' similar precedent, including a holding that "the defendant township had a legitimate interest in controlling population growth and density and the zoning amendments [at issue] were a rational and reasonable means to accomplish that purpose.") (internal quotation marks and citations omitted)). It is also "reasonable" for the

legislature to place restrictions on the hours at which alcohol can be sold or served at liquor licensed establishments. Put simply, "[t]here is a logical correlation between the sale and distribution of alcohol during the early morning hours, [the size the venue selling or distributing alcohol during those hours], and the influx of crime, noise, and vehicular infractions in the area where that alcohol is sold." *Broadwell v. Mun. of San Juan*, 312 F. Supp. 2d 132, 140-41 (D.P.R. 2004) (citations omitted).

Rational basis review "is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Parrish v. Consol. City of Jacksonville*, No. 304CV986, 2005 WL 1500894, at * 3 (M.D. Fla. June 22, 2005) (citations omitted). As such, even if Defendant could have more precisely determined whether 4,750 square feet was an appropriate size restriction or whether 11:00 p.m. was a closing time appropriate to reduce crime and disruption, the Court nonetheless will not second guess the propriety of Defendant's determination.

After a review of the record, the Court finds Defendant clearly described a "conceivably rational basis" between the Ordinances and a legitimate government interest. "Reasonable minds may differ as to where the line should be drawn or whether a line should be drawn at all, but the discretion to resolve that agreement lies with the County, not the courts." *Ga. Mfr. Hous. Assn.*, 148 F.3d at 1307 (citing *Haves*, 52 F.3d at 923-24.) Plaintiffs do not argue that Defendant enacted the Ordinances to "retaliate against" them,[11] and the Court has already determined that they have failed to meet their burden to show it was enacted with "discriminatory purpose." Accordingly, the Court grants summary

---

[11] *See Reserve, Ltd. v. Town of Longboat Key*, 17 F.3d 1374, 1381 (11th Cir. 1994) (finding a material issue of fact "as to the reason for the revocation of [the plaintiff's] permit" precluded summary judgment).

judgment in favor of Defendants on Count II as well.

**B.    Counts III & IV:  Equal Protection**

**1.    Applicable Law**

The Equal Protection Clause requires the government to treat similarly situated individuals in a similar manner. *Gary v. City of Warner Robins*, 311 F.3d 1334, 1337 (11th Cir. 2002). "When legislation classifies persons in such a way that they receive different treatment under the law, the degree of scrutiny the court applies depends upon the basis for the classification." *Id.* "If a law treats individuals differently on the basis of race or another suspect classification, or if the law impinges on a fundamental right, it is subject to strict scrutiny." *Avera v. Airline Pilots Ass'n Intern.*, 436 F. App'x 969, 974 (11th Cir. 2011) (citing *Eide v. Sarasota Cnty.*, 908 F.2d 716, 722 (11th Cir.1990)). Otherwise, the law need only be rationally related to a legitimate government purpose. *Id.*

Equal protection claims fall into three categories. *Maxi-Taxi of Fla., Inc. v. Lee Cnty. Port Auth.*, No. 2:07CV82, 2008 WL 1925088, at *6 (M.D. Fla. Apr. 29, 2008) (citing *E&T Realty v. Strickland*, 830 F.2d 1107 (11th Cir. 1987)).  The first type of equal protection claim is "a claim that a statute discriminates on its face." *See E & T Realty,* 830 F.2d at 1112 n.5.  "The second type of claim is one in which the party alleges 'that the neutral application of a facially neutral statute has a disparate impact.' " *Maxi-Taxi*, 2008 WL 1925088, at *6.  In order to prove a statute has a "disparate impact," the plaintiff must show "purposeful discrimination." *Id.*  The third type of equal protection claim alleges that the government "unequally administers a facially neutral statute." *Id.*  The plaintiff may be successful if they prove they have "been treated differently than others similarly situated and there is no rational basis for the disparate treatment." *Id.* at n.8 (citations omitted).

22

Although Plaintiffs do not clearly articulate the nature of their equal protection claims , the Court ascertains their allegations fall into the second and third "type" of equal protection claim.

### 2. Count III: Equal Protection ("Class of One")

Plaintiffs argue that Defendant violated the third type of equal protection, also known as a "class of one" equal protection claim. They maintain that the Ordinances "intentionally treat them differently from others similarly situated and . . . there is no rational basis for the difference in treatment." *See id.* at *6 (citations omitted). In order for Plaintiffs to assert a cognizable "class of one" claim, they must first establish "similarly situated" comparators that are "*prima facie* identical in all relevant respects." *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1203 (11th Cir. 2007) (citations omitted); *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006); *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002); *see Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000).

It requires little effort to determine that Plaintiffs fail to meet the "heavy burden" to show they are being treated differently from "prima facie identical" establishments. *See Hicks v. Jackson Cnty. Comm'n*, 374 F. Supp. 2d 1084, 1096 (N.D. Ala. 2005). The Amended Complaint identifies the following similarly situated "comparators:" (a) All other competing venues which are licensed to sell alcoholic beverages for consumption on or off premises; (b) All other competing venues which are situated in buildings that are smaller than 4,750 square feet which are licensed to sell alcoholic beverages for consumption on or off premises; (c) All other competing restaurants which are licensed to sell food; and (d) all other businesses were are engaged in lawful activities in Clay County, Florida. (Doc. No. 19, ¶ 76.) In their Motion for Summary Judgment, Plaintiffs do not explain with any

degree of specificity how these comparators are "prima facie identical."

These allegations preclude a finding that the alleged comparators are other "similarly situated establishments" in the Wells Road Corridor. Plaintiffs essentially ask the Court to compare them to smaller establishments, restaurants, and "all other businesses which are engaged in lawful activities in Clay County Florida." (Doc. No. 19, ¶ 76.) These do not constitute other "large lounges" and thus, are not "similarly situated" for the purposes of this type of equal protection analysis. "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently [establishments that] are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Because Plaintiffs have failed to provide any examples of "similarly situated" establishments, they cannot prove an essential element to their "class of one" claim. As such, Defendant is entitled to summary judgment on Count III.[12]

### 3. Count IV: Equal Protection (Race Discrimination)[13]

---

[12] Plaintiffs framed the issue asserted in Count III of their Complaint as follows: "Whether [Defendant] may set different hours of operation for competing venues based solely on the size of a building in which the business is located." (Doc. No. 49, p. 17.) This is not an appropriate articulation of the equal protection claim presented here. The Court does not, in a case such as this, determine whether the legislature "may" or "may not" do; it determines whether what the legislature has done, *i.e.*, whether the legislation enacted, is constitutional. Although the Court does not reach the issue of whether Defendant had a "rational basis" for treating Plaintiffs differently from similarly situated establishments, the Court reiterates that it matters not whether the Court finds the legislation to be well advised, appropriate or even reasonably calculated to achieve the stated goal. Rather, the inquiry is limited to whether the legislative body described a rational basis for the enactment.

[13] The Court notes that if Plaintiffs were able to prevail on their "race discrimination" equal protection claim, which they are not, it would be required to apply a "strict scrutiny" standard of review to determine whether the Ordinances are constitutional. Because Plaintiffs do not provide sufficient evidence to show discriminatory purpose and discriminatory intent for the reasons discussed herein, the Court finds that the Ordinances do not "target a protected class," and thus need not review the Ordinances under a higher standard of scrutiny. *United States v. Sanders*, 731 F. Supp. 2d 1261, 1269 n.4 (M.D. Fla.

Next, Plaintiffs contend that the Ordinances deprive them equal of protection under the law because they disparately impact racial minorities, and were enacted with discriminatory purpose. As noted above, in order to prevail on this "second type" of equal protection claim, Plaintiffs must show that "discrimination was a substantial or motivating factor" for enacting the law. *Young Apartments, Inc. v. Town of Jupiter, Fla.*, 406 F. App'x 376, 377 (11th Cir. 2010) (citing *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1223 (11th Cir. 2005) (en banc)). To show Defendant acted with discriminatory motive, Plaintiffs "may use evidence of a disparate impact on a racial minority in conjunction with **specific evidence** establishing race was a motivating factor in the government decision." *Id.* (emphasis in original) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977)).

Plaintiffs maintain that "Clay County singled out the Plaintiffs' businesses for closure because: Club Christophers caters to a predominantly black clientele; [Crazy Horse] which caters primarily to whites was perceived by the County as catering to black clientele; and Club Chameleon – the other large entertainment venue which is the target of the ordinance– caters primarily to Hispanics and blacks." (Doc. No. 19, ¶ 80.) The only record evidence relevant to this claim is Plaintiffs' response to Defendant's First Set of Interrogatories (Doc. No. 47-13), in which they were asked to "[d]escribe specifically and in detail all facts upon which you base your allegation, set forth in paragraph 80 of the Amended Complaint, that 'Clay County singled out Plaintiffs' businesses for closure because: Club Christophers caters to a predominantly black clientele.' " (Doc. No. 47-13,

2010) ("Only when a party can show intentional discrimination by the Government is the application of the more rigorous strict scrutiny test of a classification affecting a protected class properly invoked.")

p. 12.)  In response, Plaintiffs included the following:

Historical pattern of harassment by Clay County Sheriff's Office.

In 2007 Sheriff's Office attempted to deprive club's patrons of parking.

Ongoing harassment by Clay County Sheriff's Office designed to stop and harass club's patrons.

Ongoing harassment such as walk-throughs of Club's parking lot without permission. During a recent walk-through Clay County Sheriff's Officers confronted three off-duty JSO officers who were patrons of the club in whose vehicles they spotted guns.

Cummings - comments following girl's death. Black person did the crime.

Known as black venue.

Comments made at CCR meeting suggest a racial animus.

(Doc. No. 47-13, p. 5.)

Plaintiffs do not offer any evidence to substantiate that the alleged "harassment" and "walk-throughs" are due to racial animus, nor do they explain how Club Christophers reputation as a "black venue," if true, necessarily establishes that the Ordinances were enacted with a discriminatory motive.   Furthermore, ironically, after a review of the "CCR meeting" transcript, it appears Plaintiffs' counsel was the only one who made a statement corroborating the assertion that the Board acted with discriminatory intent.  (May 10, 2011 Hr'g Tr. at 50:8-12 (Plaintiffs' counsel asserting the Ordinances serve as "an approach to close down these large dance venues that cater to black and Hispanic clientele. Let's call it what it is because that is what this is about.").)  Finally, Plaintiffs cite a newspaper article "discuss[ing] the goal" of discouraging people who reside outside of Clay County from

coming into the County to go to the large lounges. (*See* Doc. No. 55, p. 10.) Nowhere in this article, however, does it state that they are seeking to discourage members of a suspect class from entering the Wells Road Corridor.

"[A]fter adequate time for discovery and upon motion, [summary judgment is appropriate] against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "Accordingly, in response to a motion for summary judgment, a nonmoving-plaintiff must **present evidence** in support of his allegations sufficient to raise a genuine issue of material fact regarding each element of his claim." *Maxi-Taxi of Fla., Inv. v. Lee Cnty. Port Auth.*, 301 F. App'x at 885 (emphasis added). Where the nonmoving party fails to present such evidence, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (quoting *Celotex*, 477 U.S. 317 at 323). Plaintiffs fail to present any evidence to establish discriminatory motive on the part of the Board. Their unsupported allegations require this Court to take an inferential leap that would be inappropriate at this point in the litigation. Plaintiffs have not met their burden to show a material issue of fact remains regarding this claim, and as such, Defendant is entitled to a grant of summary judgment as to Count IV.

### D.    Count V:  Reverse Spot Zoning

Finally, Plaintiffs allege that the Zoning Ordinance is a "defacto amendment to the City's zoning code by effectively making it impossible to operate a Large Lounge within the affected commercial Wells Road corridor" because it was specifically designed to target

27

Plaintiffs' entertainment venues." (Doc. No. 19, ¶¶ 82-83.)  In other words, they allege that

Defendants engaged in what is sometimes referred to as "reverse spot zoning."  It is

unclear whether Plaintiffs intended to assert this claim as a separate cause of action or

intended this to be part of their overall Section 1983 claim.  To the extent Plaintiffs are

asserting that the Ordinances give preferential treatment to other similarly situated

businesses (*see* Doc. No. 19, ¶ 91), this issue would be resolved according to the equal

protection analysis set forth in Section B, Part 2, above. If, instead, Plaintiffs intended to

assert a state law claim, the Court dismisses Count V, pursuant to 28 U.S.C. §1367(a)

without prejudice to allow Plaintiff to pursue such a claim in state court.[14]

### CONCLUSION

In light of the foregoing, it is hereby **ORDERED AND ADJUDGED:**

1)      Defendant Clay County, Florida's Motion for Summary Final Judgment
and Incorporated Memorandum of Law (Doc. No. 47), filed on
November 3, 2011 is **GRANTED as to Counts I-IV** of Plaintiffs'
Amended Complaint (Doc. No. 19).

2)      Defendant Clay County, Florida's Motion for Summary Final Judgment
and Incorporated Memorandum of Law (Doc. No. 47), filed on
November 3, 2011 is **DENIED as to Count V** of Plaintiffs' Amended
Complaint (Doc. No. 19). **Count V is DISMISSED WITHOUT
PREJUDICE.**

3)      Plaintiffs' Motion for Summary Judgment and Incorporated

---

[14]  The Court has made no determination as to whether the allegations set forth in
Count V state a cause of action sufficient to withstand a motion to dismiss at the state court
level.

Memorandum of Law (Doc. No. 49), filed on November 3, 2011, is **DENIED.**

4)   The Clerk is **DIRECTED** to enter judgment in substantially the following form:

> IT IS ORDERED AND ADJUDGED THAT:
>
> (1)   Plaintiffs, Green Cedar, LLC, Fouad Ghantous, Phredco, Inc., White Nite, Inc., Christopher White, and James Spooner, recover nothing; all claims except Count V ("Reverse Spot Zoning") be dismissed on the merits; and Defendant Clay County, Florida recover costs from Plaintiffs.
>
> (2)   Plaintiffs, Green Cedar, LLC, Fouad Ghantous, Phredco, Inc., White Nite, Inc., Christopher White, and James Spooner, recover nothing on Count V ("Reverse Spot Zoning"), which is dismissed without prejudice, as the Court declines to exercise jurisdiction over this claim.

**DONE AND ORDERED** in Chambers in Jacksonville, Florida, on February 7, 2012.

ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record